**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| MICHAEL FEELER, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>WYSSTA SERVICES, INC.,<br><br>*Defendant.* | Case No. 1:25-cv-794 |

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Michael Feeler, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Wyssta Services, Inc., to put an end to its unlawful disclosure of Plaintiff's and the proposed Class's protected health information. Upon personal knowledge as to Plaintiff's own conduct, and on information and belief as to all other matters, including based on an investigation by counsel, Plaintiff complains and alleges as follows:

**NATURE OF THE ACTION**

1. This is a class action against Defendant for violating Plaintiff's privacy rights by disclosing Plaintiff's and other Delta Dental plan members' personally identifiable information ("PII") and non-public personal health information ("PHI" and, together with PII, "Private Information") to various third parties. Defendant accomplished these disclosures through the use of hidden tracking code integrated by Defendant into the online healthcare portal they operate https://my.deltadentalcoversme.com/ (the "Website") on behalf of various Delta Dental entities that engaged Defendant to operate the Website for the use and benefit of Delta Dental plan members, including Delta Dental of Illinois plan members.

2. Specifically, in order to gain additional insights into Delta Dental plan members, improve return on marketing spend and, ultimately, increase revenue, the Delta Dental Companies (defined below) and Defendant encouraged Plaintiff and Class Members to access and use various digital tools made available on the Website, including, among other things, to find dentists within their particular insurance plan and geographic area.

3. Plaintiff and Class Members who visited and used the Website understandably thought they were communicating *only* with their trusted health plan.

4. Unbeknownst to Plaintiff and Class Members, however, Defendant embeds certain tracking technologies on the Website—including tracking technologies offered by the online advertising company Google—that automatically transmit confidential details about plan members' use of the Website to Google.

5. Operating as designed and as implemented by Defendant, the tracking technologies allowed the Private Information that Plaintiff and Class Members provided to Defendant to be unlawfully disclosed to Google alongside unique and persistent identifiers that identify the individual plan member in a manner that violates federal and Illinois law.

6. By installing the tracking technologies, Defendant effectively planted a bug on Plaintiff's and Class Members' web browsers and compelled them to disclose their private health-related data and communications to Google. The data and communications intercepted by Google via the tracking technologies at issue disclosed, among other things, that the specific individual using the Website was (a) a Delta Dental plan member; and (b) seeking treatment for oral healthcare from dentists (as well as details about their preferred type of provider). Google, in turn, used the information to, among other thing, create individual profiles of the Delta Dental plan members for the purposes of targeting them with advertising.

7. Plan members simply do not anticipate that their trusted health plan, and the affiliates that facilitate their communications with the health plan, will send plan members' personal health information or confidential medical information to third parties without the plan members' informed and express consent.

8. Neither Plaintiff nor any other Class Member were provided, much less signed, a written authorization permitting Defendant to disclose their Private Information to Google.

9. Despite intentionally incorporating the tracking technologies into the Website, and encouraging plan members to provide Private Information to their health plan through the Website, Defendant never disclosed to Plaintiff or Class Members that they shared the information provided by plan members through the Website with Google.[1]

10. Plaintiff and Class Members were unaware that their Private Information was being surreptitiously transmitted to Google as they communicated with Defendant via the Website so it could be used for targeted advertising and marketing purposes.

11. The disclosure of Plaintiff's and Class Members' Private Information via tracking technologies contravenes the letter and spirit of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). As part of HIPAA, the United States Department of Health and Human Services ("HHS") established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how covered

[1] In contrast to Defendant, several medical providers which have installed similar tracking technologies on their web properties have provided their plan members with notices of data breaches caused by the technology transmitting PHI to third parties. *See*, *e.g.*, *Cerebral, Inc. Notice of HIPAA Privacy Breach*, available at https://cerebral.com/static/hippa_privacy_breach-4000c6eb21449c2ecd8bd13706750cc2.pdf (last visited Aug. 28, 2024); *Advocate Aurora says 3M plan members' health data possibly exposed through tracking technologies* (Oct. 20, 2022), available at https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3 (last visited Aug. 28, 2024); *Novant Health notifies plan members of potential data privacy incident* (Aug. 19, 2022), available at https://www.prnewswire.com/news-releases/novant-health-notifies-patients-of-potential-data-privacy-incident-301609387.html (last visited Aug. 28, 2024).

entities, such as health plans and their business associates, must safeguard and protect Private Information.

12. Simply put, under the HIPAA Privacy Rule, covered entities and their business associates, such as Defendant, are ***not*** permitted to use tracking technology tools in a way that exposes plan members' Private Information to any third-party without express and informed consent and a written authorization from each patient.

13. Lest there be any doubt of the illegal nature of Defendant's practice, the Office for Civil Rights (OCR) at HHS has made clear, in a bulletin entitled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, that the unlawful transmission of such protected information violates HIPAA's Privacy Rule:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[2]

14. Similarly, the FTC also addressed these privacy concerns:

> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. ***But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out***.[3]

15. Defendant further made express and implied promises to protect Plaintiff's and Class Members' Private Information and maintain the privacy and confidentiality of communications that plan members exchanged with Defendant, including via the Website.

---

[2] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Jan. 7, 2025) (emphasis added).

[3] Elisa Jillison, *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases*, the FTC Business Blog (July 25, 2023) (emphasis added))

Furthermore, by obtaining, collecting, using and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties to those individuals to protect and to safeguard that information from unauthorized disclosure.

16. Defendant breached its obligations in one or more of the following ways: (i) failing to adequately review its marketing programs and web based technology to ensure the Website was safe and secure; (ii) installing technology on the Website that was known and designed to share plan members' interactions with the Website with Google; (iii) failing to remove or disengage that technology after installing it; (iv) failing to obtain the consent of Plaintiff and Class Members to disclose their PII and PHI to Google; (v) failing to take steps to block the transmission of Plaintiff's and Class Members' PII and PHI through the tracking technologies; (vi) failing to warn Plaintiff and Class Members; and (vii) otherwise failing to design and monitor the Website to maintain the confidentiality and integrity of plan member PII and PHI.

17. Plaintiff and Class Members have suffered injury as a result of Defendant's conduct; these injuries include: (i) invasion of privacy; (ii) loss of benefit of the bargain, (iii) compromise and disclosure of Private Information and identities, (iv) loss of value of their Private Information, (v) non-payment of a fair and reasonable royalty for Defendant's use of their Private Information for marketing purposes; (vi) violations of statutory rights and related statutory damages, and (vii) the continued and ongoing risk to their Private Information, which can—and likely will—be further disseminated to additional third parties utilizing the data for retargeting advertising.

18. Plaintiff, on behalf of himself and all others similarly situated, now asserts claims under the federal Electronic Communications Privacy Act ("ECPA") and the Illinois' Eavesdropping Statute, seeking damages and an injunction to stop this unlawful data sharing.

## PARTIES

19. Plaintiff Michael Feeler is a resident of Sullivan, Illinois. Plaintiff Feeler has dental insurance through Delta Dental of Illinois. In 2024, Plaintiff used a Chrome browser on his computer and logged into Defendant's healthcare portal and searched for a dentist that was covered in his Delta Dental of Illinois insurance network by using the Website operated by Defendant. Plaintiff Feeler had a Google account when he searched for a dentist on the Website. Through the systematic data sharing process described in this complaint, the communications Plaintiff exchanged with the Website were intercepted by the tracking technologies at issue and simultaneously disclosed to Google. Plaintiff Feeler did not consent to these disclosures. Plaintiff Feeler would not have searched for a dentist through the Website had he known that his personal data was disclosed to third parties. After Plaintiff Feeler searched for a dentist through the Website, he received advertisements for Delta Dental and other insurance providers.

20. As described throughout this complaint, Defendant entered into one or more agreements with Delta Dental of Illinois to operate the Website on behalf of Delta Dental of Illinois for the use and benefit of Delta Dental Illinois' plan members, like Plaintiff.

21. Wyssta Services, Inc. is a Wisconsin corporation with its principal place of business in Wisconsin.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it arises, in part, under the laws of the United States. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are based on a common nucleus of operative facts (*i.e.*, the exact same tracking technologies and disclosures), and form part of the same case or controversy, as Plaintiff's claims under federal law.

23. This Court has personal jurisdiction over Defendant because they agreed to develop and operate a Website for the benefit of Delta Dental of Illinois' plan members in Illinois, targeted the Website at Illinois residents, and caused the Website to install tracking technology directly onto Website users' computers in Illinois, which intercepted communications with the Website in Illinois and sent that data from Illinois to third-party marketing companies. Plaintiff used the Website in Illinois, the tracking technology was placed on his computer in Illinois, and Plaintiff's communications were intercepted in Illinois and sent from Illinois to Google.

24. Venue is proper under 18 U.S.C § 1391(b) because a substantial part of the events or omissions giving rise to the claims at issue occurred in this District.

## COMMON FACTUAL ALLEGATIONS

### I. *Background on Web Browsers, Source Code, & Tracking Technologies.*

25. Web browsers are software applications that allow consumers to exchange electronic communications over the Internet.

26. Every website is hosted by a computer server through which the entity in charge of the website exchanges communications with Internet users via their web browsers.

27. The set of instructions that commands the browser is called the source code.

28. Source code may also command a web browser to send data transmissions to third parties via technologies that effectively open a spying window through which a website funnels data about users and their actions to third parties.

29. Tracking technologies are installed by web developers on pages of the websites they host that are run on the host's servers. These third-party tracking technologies are typically configured to track user data and communications for marketing purposes.

30. Thus, without any knowledge, authorization, or action by a user, a website

developer like Defendant can use its source code to commandeer the user's computing device, causing the device to contemporaneously and invisibly re-direct the users' personally identifiable non-public medical information and communications to third party technology vendors.

31. When a user accesses a website hosting a tracking tool, the tracking tool software is surreptitiously installed on the users' computer in the location where the computer exists, and thereafter directs the user's browser to send its communications with the hosting website to the third-party technology provider.

32. The transmission to the third-party technology provider contains the original requests exchanged between the users' web browser and the host website (called a "GET request" and a "POST request"), along with additional data that the tracking technology is configured to collect. The original GET and POST requests exchanged between the users' web browser and the website include the webpage's Universal Resource Locator ("URL") and other metadata, including the IP address associated with the website user's device.

33. The transmission to the third-party technology vendor is initiated by a tracking tool's code and occurs concurrently with the communications between the user's web browser and the the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and read the host website—the host's own code, and a tracking tool's embedded code.

34. Once the third-party technology vendor collects the information intercepted and transmitted by the tracking technology, the third-party can store and use the information for various business purposes of their own, including selling targeted advertising.

## II. ***How Defendant Discloses Class Members' Protected Health Information and Assists with Intercepting Communications from the Healthcare Portal on https://my.deltadentalcoversme.com/.***

35. Defendant operates the Website available at https://www.deltadentalcoversme.com

for the benefit of plan members for at least the following Delta Dental companies: Delta Dental of Arkansas; Delta Dental of Colorado; Delta Dental of Connecticut; Delta Dental of Illinois; Delta Dental of Kansas; Delta Dental Plan of Maine; Delta Dental of Missouri; Delta Dental Plan of New Hampshire; Delta Dental of New Jersey; Delta Dental of North Carolina; Delta Dental of Oklahoma; Delta Dental of South Carolina; Delta Dental Plan of Vermont; Delta Dental of Virginia; Delta Dental of Washington; and Delta Dental of Wisconsin (collectively, the "Delta Dental Companies").

36. Defendant maintains the Website as a healthcare portal on which Delta Dental plan members can communicate with the Delta Dental Companies, including but not limited to exchanging communications about in-network dentists.

37. The Delta Dental Companies and Defendant actively encourage plan members to use the Website, including to identify dentists that are in their network.

38. A plan member can log into the Website portal from at https://www.deltadentalcoversme.com or, in the case, of Delta Dental of Illinois plan members, for instance, can be directed to log into their healthcare portal from Delta Dental of Illinois' website.

39. After a plan member logs into the Website portal, the plan member lands on their Dashboard, which, among other things, permits plan members to "Find a Dentist." Defendant's landing page shows how the Website is designed for use by plan members. The landing page prompts members to "Find a Dentist" that best meets the plan members' needs by first inputting their city, zip code, or address. Plan members can also include additional search parameters to tailor their search by network (*e.g.*, PPO), specialty, gender of the healthcare provider, and language(s) spoken. Plan members can also search for specific dentists or clinics in a given

geographic radius.

40. Defendant's Website permits users to view the search results for in-network providers located near them and to click on the search results. By clicking on a search result for an in-network dentist, the user is transported to the dentist's profile, which they can review to evaluate whether to seek an appointment.

41. Defendant installed tracking technologies offered by Google on the Website for marketing purposes.

42. By many measures, Google is the world's largest data company. Among other services, Google operates the world's most popular search engine (Google), email provider (Gmail), video website (YouTube), mapping service (Google Maps), Internet analytics service for web developers (Google Analytics), and web-browser (Chrome). It also operates various ad services that are among the world's most popular in their respective category, including the advertising services of Google DoubleClick and Google AdWords.

43. Google Analytics in particular has massive reach. As described by the Wall Street Journal, it is "far and away the web's most dominant analytics platform" and "tracks you whether or not you are logged in."[4]

44. Google offers developers different types of cookies to deploy on their websites to track user activity for marketing purposes (collectively, the "Google Tracking Pixel"). Defendant installed the Google Tracking Pixel on the Website. To Google Tracking Pixel installed on the Website was configured to deploy several cookies—and install those cookies on Website user's computers whenever the accessed the Website—including, for example, the _ga cookie, which is

[4] *Who Has More of Your Personal Data than Facebook? Try Google*, The Wall Street Journal (April 22, 2018) (available at https://www.wsj.com/articles/who-has-more-of-your-personal-data-than-facebook-try-google-1524398401).

used to collect information that Google later uses to build custom audiences for ad targeting.

45. Google connects the data received via the Google Tracking Pixel to a person's Google Account and other personal identifiers. In particular, Google combines the data and communications it receives from the Website with the following other pieces of information in the same systems:

a. Google Account ID

b. IP address

c. User-Agent

d. Precise Geo-location

e. Shipping Address

f. Areas of Interest

g. PPID

h. Device ID

i. First Party User ID

j. Buy Side Publisher ID

k. DUSI

l. YouTube Visitor ID

m. Credit Card Information

n. Age

o. Gender

p. Race

q. Ethnicity

r. Income

s. Children

46. Additionally, Google Analytics may also use third-party Google __secure cookies associated with a Google Account when a user is logged into a Google or Gmail Account to track a user on non-Google web sites.

47. Defendant incorporated the Google Tracking Pixel into the Website.

48. Through the Google Tracking Pixel, Defendant assisted the interception of and disclosed the following non-public private information to the Google:

a. Plaintiff's and Class Members' status as plan members;

b. Plaintiff's and Class Members' communications with the Website through the Website;

c. Plaintiff's and Class Members' need for dental services, the type of dentist (e.g., general or a specialist), the insurance plan type, and the location of the patient (among other confidential details about their healthcare provider);

d. Personally identifiable information including but not limited to plan members' locations, an IP address, device identifier and/or an individual's unique and persistent identifier or identifiers that Google can use to identify Plaintiff and Class Members in the real world.

49. When a plan member visits the Website, the Google Tracking Pixel causes the associated cookies to be installed on the user's computer.

50. After the cookies are installed on the Website user's computer, the Google Tracking Pixel causes personal identifiers to be transmitted to Google along with the fact that the plan member has exchanged a communication with the Website and the contents of the communication, including:

a. Plan member IP addresses;

b. Unique, persistent identifiers that are linked to and can be used to identify the plan member;

c. Device identifiers;

d. The "GET request" and "POST request" exchanged between the Website and the Website user's web browser (in which communications the web browser requests, and the Website responsively sends, the webpage requested by the user);

e. The specific webpages (*i.e.*, URL(s) the user visits, which, in the case of https://my.deltadentalcoversme.com/, includes descriptive information regarding the fact that a plan member logged in and is using of the Website, including to search for dentists through the "Find a Dentist" features, which includes their city, zip code, or address, network (e.g., PPO), specialty, gender, and language(s) spoken;

f. If a plan member searches for a specific doctor or clinic, the name of the doctor or clinic; and

g. If a plan member selects a specific dentist to evaluate further, the dentist office ID.

51. Thus, the information included in the disclosure reveals that Plaintiff and Class Members are Delta Dental plan members that are searching for medical care and information regarding their preferred medical providers. For example:

a. When a plan member logs into the Website, Defendant shares with Google the fact that a plan member has logged in, which confirms to Google that the plan

member is a plan member.

b. When a plan member uses Defendant's tools to request information about in-network providers, Delta Dental shares the requests with Google.

c. Simultaneously with the plan member telling Defendant that he is requesting information about in-network providers, Defendant surreptitiously transmits to Google the plan member's IP address, and other unique identifiers.

d. When the plan member inputs his search criteria and communicates with the Website that the plan member wants to find a dentist, Defendant returns the results of the query with information about dentists within the members' plan located near the member. When the plan member communicates with Defendant that the plan has identified a dentist to evaluate by clicking on a provider profile link, the plan member is transported to the provider's profile page. Google, in turn, learns the details of the plan members' communications with Defendant to narrow their search parameters and, if a plan member selects a dentist, Google learns that dentist's office ID.

52. The contents of these communications disclose that the individual on the Website is a plan member both implicitly (because they identify the individual as someone using the Website) and explicitly (because the communication shows the member was authenticated through Defendant's healthcare portal).

53. This information is transmitted to Google alongside unique personal identifiers, such the user's IP address; the type of browser and the type of operating system (called user-agent data); and the time it was sent (called a timestamp).

54. Defendant causes multiple data transmissions containing this type of personally

identifiable plan member information to be made to Google contemporaneously with the transmission of the user's communications with the Website.

55. Defendant causes similar data transmissions to be sent to Google with every communication that a plan member exchanges with the Website.

56. These disclosures occur contemporaneous to the primary communication between Class Members, including Plaintiff, and the Website. For example, Google receives the exact contents of the "GET request" and thus before the webpage requested has been rendered on the screen of the plan member's device and while the communication between Defendant and plan members remains ongoing. This is just an example, and the Google Tracking Pixel performs this contemporaneously interception with each communication with the Website it is configured to intercept.

57. All of these transmissions are hidden from the plan member. Instead, the plan member only sees the rendered page, without an indication of third-party interception or disclosure.

58. Defendant uses the same tools and source code throughout the Website, and the types of personally identifiable plan member data and contents of plan member communications are similar and similarly intercepted and transmitted every time a plan member uses the Website, regardless of where the plan member goes on the Website.

59. This is precisely the type of information that HIPAA requires regulated entities to de-anonymize to protect the privacy of plan members.[5]

60. Plaintiff's and Class Members' identities could be easily determined based on the information that was improperly disclosed.

[5] *See* https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Jan. 7, 2025).

61. After intercepting and collecting this information, Google processes it, analyzes it, and assimilates it into datasets about the plan members, which Google uses for its own benefit, including to target plan members with advertising.

62. Plaintiff's and Class Members' Private Information would not have been disclosed to Google but for Defendant's decisions to install the Google Tracking Pixels on its Website.

63. By installing and implementing the Google Tracking Pixels, Defendant caused Plaintiff's and Class Members' communications with the Website to be intercepted and transmitted to Google.

64. Class Members, including Plaintiff, do not consent or authorize these interceptions and disclosures.

65. These disclosures are not required or necessary for Defendant's website or services to function.

## III. *Defendant's Privacy Statement & Promises*

66. Defendant publishes a Privacy Statement for DeltaDentalCoversMe.com.[6]

67. Defendant emphasizes: "*We do not sell or rent your personal information to third parties for their marketing use*."

68. Defendant states as to PHI:

> Wyssta considers your individually identifiable health information to be private and confidential. Except as otherwise permitted or required by law, Wyssta collects, uses, and discloses your individually identifiable health information consistent with the terms of applicable HIPAA business associate agreements with the Delta Dental Companies. Applicable HIPAA business associate agreements generally permit Wyssta to use and disclose your individually identifiable health information (1) to perform functions or activities on behalf of, or provide services to, the Delta Dental Companies, in connection with their role in underwriting dental benefit coverage and administering dental benefit programs and claims, or as otherwise permitted or

[6] chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www2.deltadentalcoversme.com/enrollment/pdfs/Privacy%20Policy%20(2).pdf

> required by law including HIPAA; (2) for Wyssta's proper management and administration or to fulfill its legal responsibilities; (3) to perform data aggregation services in order to provide analysis relevant to the health care operations of the Delta Dental Companies; or (4) to create de-identified data. Where your dental coverage benefits are underwritten or administered by a Delta Dental Company, Wyssta collects, uses, and discloses your individually identifiable health information consistent with the HIPAA Notice of Privacy Practices pertaining to your dental plan.

69. Defendant's assurances that it will keep plan members' Private Information private and confidential, are false.

70. Defendant conceals their use of the Google Tracking Pixels to track plan members' personally identifiable information.

71. Defendant violated their Privacy Statement for DeltaDentalCoversMe.com by unlawfully intercepting and disclosing Plaintiff's and Class Members' Private Information to Google without adequately disclosing that Defendant shared Private Information with third parties and without acquiring the specific plan members' consent or authorization to share the Private Information.

72. Defendant violated the HIPAA Notice of Privacy Practices pertaining to plan members' dental plans by unlawfully intercepting and disclosing Plaintiff's and Class Members' Private Information to Google without adequately disclosing that Defendant shared Private Information with third parties and without acquiring the specific plan members' consent or authorization to share the Private Information.

## IV. ***Defendant Violated HIPAA.***

73. Plan member health care information in the United States is protected by federal law under HIPAA and its implementing regulations, which are promulgated by the HHS.

74. The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually

identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[7]

75. The Privacy Rule broadly defines "protected health information" ("PHI") as "individually identifiable health information" ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

100. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

101. Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2)(i) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

A. Names;
***
H. Medical record numbers;
***

[7] HHS.gov, Health Information Privacy (Mar. 31, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

> J. Account numbers;
> ***
> M. Device identifiers and serial numbers;
> N. Web Universal Resource Locators (URLs);
> O. Internet Protocol (IP) address numbers; … and
> R. Any other unique identifying number, characteristic, or code…; and
>
> (ii) the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 164.514.

102. In a Health and Human Services' Health Information Privacy Bulletin ("HHS Privacy Bulletin"), Health and Human Services ("HHS") confirmed that HIPAA's protections apply to regulated entities' use of tracking technologies on authenticated webpages, such as Defendant's use of the Google Tracking Pixels on the Website and related subpages.[8] Specifically, HHS explained that "Tracking technologies on a regulated entity's user-authenticated webpages generally have access to PHI. Such PHI may include, for example, an individual's IP address, medical record number, home or email addresses, dates of appointments, or other identifying information that the individual may provide when interacting with the webpage."[9]

103. The HIPAA Privacy Rule requires any "covered entity"—which includes health plans and business associates like Defendant—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

[8] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. Dept' of Health & Human Services (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html ("HHS Privacy Bulletin").
[9] *Id.*

104. An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

105. The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant when it is knowingly disclosing individually identifiable health information relating to an individual, as those terms are defined under HIPAA.

106. Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

**i. *Plan member status is among the health information protected by HIPAA***

107. An individual's status as a plan member is protected by HIPAA.

108. In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the Department instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to

health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this Information would be PHI.[10]

109. In its guidance for Marketing, the Department further instructs:

The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, ***covered entities may not sell lists of patients or enrollees to third parties*** without obtaining authorization from each person on the list. (Emphasis added).[11]

110. The instructions continue:

For example, it is "marketing" when: . . . A health plan sells a list of its members to a company that sells blood glucose monitors, which intends to send the plan's members brochures on the benefits of purchasing and using the monitors.

111. HHS has instructed for decades that patient status – identical to plan member status – is protected by the HIPAA Privacy Rule:

a. "The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

b. "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," 67 Fed. Reg. 53186 (Aug. 14, 2002), which includes disclosure of mere status with the covered entity, such a patient or plan member list;

---

[10] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf (last visited Aug. 28, 2024).

[11] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf (last visited Aug. 28, 2024).

c. It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013).

**ii. *There is no HIPAA exception for marketing on the Internet.***

112. HHS issued a bulletin in December 2022 (the "Bulletin") "to highlight the obligations" of covered entities, such as health plans and their business associates, under the HIPAA Privacy Rule "when using online tracking technologies" such as the "Google Analytics," which "collect and analyze information about how internet users are interacting with a regulated entity's website or mobile application."[12]

113. In the Bulletin, HHS reminded covered entities that HIPAA applies to covered entities', including health plans' and their business associates', use of tracking technologies like the Google Tracking Pixels at issue here. Among other things, HHS explained that covered entities, such as health plans and their business associates, violate HIPAA when they use tracking technologies that disclose an individual's identifying information (like an IP address) even if no treatment information is included and even if the individual does not have a relationship with the health care provider:

> *How do the HIPAA Rules apply to regulated entities' use of tracking technologies?*
>
> Some regulated entities may be disclosing a variety of information to tracking technology vendors through tracking technologies placed on the regulated entity's website or mobile app, such as information that the individual types or selects when they use regulated entities' websites or mobile apps. The information disclosed might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, device IDs, or any unique identifying code. In some cases, the information disclosed may meet the definition of individually identifiable health information

[12] HHS.gov, *HHS Office of Civil Rights Issue Bulletin on Requirements under HIPAA for Online Tracking Technologies to Protect the Privacy and Security of Health Information*, https://www.hhs.gov/about/news/2022/12/01/hhs-office-for-civil-rights-issues-bulletin-on-requirements-under-hipaa-for-online-tracking-technologies.html.

> (IIHI), which is a necessary pre-condition for information to meet the definition of PHI when it is transmitted or maintained by a regulated entity.
>
> IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services. But the mere fact that an online tracking technology connects the IP address of a user's device (or other identifying information) with a visit to a webpage addressing specific health conditions or listing health care providers is not a sufficient combination of information to constitute IIHI if the visit to the webpage is not related to an individual's past, present, or future health, health care, or payment for health care.[13]

114. Tracking technology vendors like Google here are considered business associates under HIPAA if they provide services to Defendant and receive or maintain PHI, as they do:

> Furthermore, tracking technology vendors are business associates if they create, receive, maintain, or transmit PHI on behalf of a regulated entity for a covered function (e.g. health care operations) or provide certain services to or for a covered entity (or another business associate) that involve the disclosure of PHI. In these circumstances, regulated entities must ensure that the disclosures made to such vendors are permitted by the Privacy Rule and enter into a business associate agreement (BAA) with these tracking technology vendors to ensure that PHI is protected in accordance with the HIPAA Rules. For example, if an individual makes an appointment through the website of a covered health clinic for health services and that website uses third party tracking technologies, then the website might automatically transmit information regarding the appointment and the individual's IP address to a tracking technology vendor. In this case, the tracking technology vendor is a business associate and a BAA is required.[14]

115. HHS explained that tracking technologies on covered entities' patient portals "generally have access to PHI" and may access diagnosis and treatment information, in addition to other sensitive data:

> Tracking on user-authenticated webpages
>
> Regulated entities may have user-authenticated webpages, which require a user to log in before they are able to access the webpage, such as a patient or health plan

[13] HHS.gov, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html. (emphasis added)/

[14] *Id.*

> beneficiary portal or a telehealth platform. ***Tracking technologies on a regulated entity's user-authenticated webpages generally have access to PHI***. Such PHI may include, for example, an individual's IP address, medical record number, home or email addresses, dates of appointments, or other identifying information that the individual may provide when interacting with the webpage. ***Tracking technologies within user-authenticated webpages may even have access to an individual's diagnosis and treatment information, prescription information, billing information, or other information within the portal***. Therefore, a regulated entity must configure any user-authenticated webpages that include tracking technologies to allow such technologies to only use and disclose PHI in compliance with the HIPAA Privacy Rule and must ensure that the electronic protected health information (ePHI) collected through its website is protected and secured in accordance with the HIPAA Security Rule.[15]

116. No PHI may be disclosed to tracking technology vendors like Google here unless Defendant has properly notified its website users and entered into a business associate agreement with the vendor (i.e., Google):

> Regulated entities may identify the use of tracking technologies in their website or mobile app's privacy policy, notice, or terms and conditions of use. However, the Privacy Rule does not permit disclosures of PHI to a tracking technology vendor based solely on a regulated entity informing individuals in its privacy policy, notice, or terms and conditions of use that it plans to make such disclosures. Regulated entities must ensure that all tracking technology vendors have signed a BAA and that there is an applicable permission prior to a disclosure of PHI.
>
> If there is not an applicable Privacy Rule permission or if the vendor is not a business associate of the regulated entity, then the individual's HIPAA-compliant authorizations are required before the PHI is disclosed to the vendor. Website banners that ask users to accept or reject a website's use of tracking technologies, such as cookies, do not constitute a valid HIPAA authorization.
>
> [I]t is insufficient for a tracking technology vendor to agree to remove PHI from the information it receives or de-identify the PHI before the vendor saves the information. Any disclosure of PHI to the vendor without individuals' authorizations requires the vendor to have a signed BAA in place and requires that there is an applicable Privacy Rule permission for disclosure.[16]

---

[15] HHS.gov, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-onlinetracking/index.html. (emphases added.)

[16] *Id*.

117. Here, neither condition—proper notice or a business associates agreement with Google—have been fulfilled.

## V. *Internet Cookies Are Personally Identifiable*

118. In the early years of the Internet, advertising on websites followed the same model as traditional newspapers. Just as a sporting goods store would choose to advertise in the sports section of a traditional newspaper, advertisers on the early Internet paid for ads to be placed on specific web pages based on the type of content displayed on the web page.

119. Computer programmers eventually developed "cookies"—small text files that web servers can place on a person's web browser and computing device when that person's web browser interacts with the website server. Cookies can perform different functions, like saving a user's login or other site settings. Eventually, some cookies were designed to acquire and record an individual Internet user's communications and activities on websites across the Internet.

120. Cookies are designed to and, in fact, most often do operate as a means of identification for Internet users.

121. Cookies are protected personal identifiers under HIPAA. *See* 45 C.F.R. § 164.514(b)(2)(i)(H), (J), (M), (N), and (R).

122. In general, cookies are categorized by (1) duration and (2) party.

123. There are two types of cookies classified by duration:

a. "Session cookies" are placed on a user's computing device only while the user is navigating the website that placed and accesses the cookie. The user's web browser typically deletes session cookies when the user closes the browser.

b. "Persistent cookies" are designed to survive beyond a single Internet-browsing session. The party creating the persistent cookie determines its lifespan. As a result, a persistent cookie can acquire and record a user's Internet communications for years and over dozens or hundreds of websites. Persistent cookies are sometimes called "tracking cookies."

124. Defendant improperly disclosed cookies along with Private Information, including values contained in the cookies associated with the Google Tracking Pixel.

## VI. *IP Addresses are Personally Identifiable Information.*

125. In addition to plan member status, URLs related to the user's efforts to find a medical provider, and other identifiers, such as the cookies associated with the Google Tracking Pixel, Defendant improperly disclosed plan members' computer IP addresses to Google through the use of the Google Tracking Pixels.

126. An IP address is a number that identifies the address of a device connected to the Internet.

127. IP addresses are used to identify and route communications on the Internet.

128. IP addresses of individual Internet users are used by Internet service providers, Website, and third-party tracking companies to facilitate and track Internet communications.

129. Google tracks IP addresses for use of tracking and targeting individual homes and their occupants with advertising by using IP addresses.

130. Under HIPAA, an IP address is considered personally identifiable information:

a. HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses. *See* 45 C.F.R. § 164.514 (2).

b. HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *See also* 45 C.F.R. § 164.514(b)(2)(i)(O).

131. Even though an IP address could be connected to several members of the same household, it is still considered PHI. That is true, *even when the individual does not have an existing relationship with the regulated healthcare entity* since when the covered entity collects this information through its website or mobile app, it is indicative that the individual has received or will receive health plan services or benefits from the medical provider.[17]

132. Consequently, Defendant's disclosure of plan members' IP addresses violated HIPAA and industry privacy standards.

**VII. *Plaintiff's & Class Members' Expectation of Privacy.***

133. At all times when Plaintiff and Class Members provided their PII and PHI to Defendant, they each had a reasonable expectation that the information would remain private, and that Defendant would not share the Private Information with third parties for a commercial purpose unrelated to patient care.

134. Plan members are aware of their health plan's duty of confidentiality, and, as a result, have an objectively reasonable expectation that their health plans will not share their personally identifiable data and communications with third parties in the absence of authorization for any purpose that is not directly related or beneficial to the plan member's care.

[17] *See* HHS.gov, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaaonline-tracking/index.html (last visited Aug. 28, 2024).

135. A recent national survey from CVS-Aetna revealed that "[p]rivacy and data security lead patients' concerns in the changing health environment." Eighty percent of survey respondents "indicated that privacy was a top concern regarding their health care, while 76 percent of individuals felt the same high level of concern for their data security." Both totals are higher than the 73 percent of consumer who indicate that cost is important to their care.

**VIII. *Defendant was Unjustly Enriched from the Use of The Google Tracking Pixels.***

136. The sole purpose of the use of the tracking technologies on Defendant's Website was marketing and profits.

137. In exchange for disclosing the personally identifiable information of its plan members, Defendant (and its parent company Delta Dental of Wisconsin) are compensated by Google in the form of enhanced advertising services and more cost-efficient marketing on Google.

138. Upon information and belief, Defendant (and the Delta Dental Companies) were advertising their services on Google, and the Google Tracking Pixels were used to help Defendant (and the Delta Dental Companies) market on Google's platforms.

139. Retargeting is a form of online marketing that targets users with ads based on their previous Internet communications and interactions.

140. Upon information and belief, Defendant (and the Delta Dental Companies) re-targeted plan members and potential plan members to get more plan members to use its services.

141. By utilizing the Google Tracking Pixels, the cost of advertising and retargeting was reduced, thereby benefitting Defendant.

142. Through its false representations and unlawful data collection, Defendant is unjustly enriching itself at the cost of consumer choice, when the consumer would otherwise have the ability to choose how they would monetize their own data.

143. Through its false representations and unlawful data collection, Defendant is unjustly enriching itself based on the value of Defendant's unauthorized access to Plaintiff's and Class members' data and communications resulting from Defendant's wrongful conduct. This value is analogous to the value for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's personal information is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of value is appropriate here under common law principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff and Class members have a protectible property interest in their data and communications; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

## IX. *Plaintiff's and Class Members' Private Information has economic value.*

144. Defendant (and Google) profit from their use of Plaintiff's and Class member's personal data to target them with advertising and for other economic benefits, such as improving their internal operations.

145. The value of personal data is well understood and generally accepted as a form of currency. The robust market for Internet user data has been analogized to the "oil" of the tech

industry.[18] A 2015 article from TechCrunch accurately noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge."[19] That article noted that the value of a single Internet user—or really, a single user's data—varied from about $15 to more than $40.

146. The Organization for Economic Cooperation and Development ("OECD") has published numerous volumes discussing how to value data such as that which is the subject matter of this Complaint, including as early as 2013, with its publication "Exploring the Economic of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[20] The OECD recognizes that data is a key competitive input not only in the digital economy but in all markets: "Big data now represents a core economic asset that can create significant competitive advantage for firms and drive innovation and growth."[21]

147. In *The Age of Surveillance Capitalism*, Harvard Business School Professor Shoshanna Zuboff notes that large corporations like Verizon, AT&T and Comcast have transformed their business models from fee for services provided to customers to monetizing their user's data—including user data that is not necessary for product or service use, which she refers to as "behavioral surplus."[22] In essence, Professor Zuboff explains that revenue from Internet user data pervades every economic transaction in the modern economy. It is a fundamental assumption of these revenues that there is a market for this data.

---

[18] https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data

[19] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/

[20] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD DIGITAL ECONOMY PAPERS, No. 220 (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf

[21] https://www.oecd-ilibrary.org/industry-and-services/supporting-investment-in-knowledge-capital-growth-and-innovation_9789264193307-en

[22] Shoshanna Zuboff, THE AGE OF SURVEILLANCE CAPITALISM 166 (2019).

148. Professor Paul M. Schwartz noted in the *Harvard Law Review*:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information.[23]

149. Likewise, in *The Wall Street Journal*, former fellow at the Open Society Institute (and current principal technologist at the ACLU) Christopher Soghoian noted:

> The dirty secret of the Web is that the "free" content and services that consumers enjoy come with a hidden price: their own private data. Many of the major online advertising companies are not interested in the data that we knowingly and willingly share. Instead, these parasitic firms covertly track our web-browsing activities, search behavior and geolocation information. Once collected, this mountain of data is analyzed to build digital dossiers on millions of consumers, in some cases identifying us by name, gender, age as well as the medical conditions and political issues we have researched online. Although we now regularly trade our most private information for access to social-networking sites and free content, the terms of this exchange were never clearly communicated to consumers.[24]

150. As Professors Acquisti, Taylor, and Wagman relayed in their 2016 article "The Economics of Privacy," published in the *Journal of Economic Literature*: "Such vast amounts of collected data have obvious and substantial economic value. Individuals' traits and attributes (such as a person's age, address, gender, income, preferences, and reservation prices, but also her clickthroughs, comments posted online, photos uploaded to social media, and so forth) are increasingly regarded as business assets that can be used to target services or offers, provide relevant advertising, or be traded with other parties."[25]

---

[23] Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 HARV. L. REV. 2055, 2056–57 (2004).
[24] Julia Angwin, *How Much Should People Worry About the Loss of Online Privacy?*, THE WALL STREET JOURNAL (Nov. 15, 2011).
[25] Alessandro Acquisti, Curtis Taylor, and Liad Wagman, *The Economics of Privacy*, 54 J. of Econ. Literature 2, at 444 (June 2016), https://www.heinz.cmu.edu/~acquisti/papers/AcquistiTaylorWagman-JEL-2016.pdf

151. The cash value of the personal user information unlawfully collected by Defendant provided during the Class Period can be quantified. For example, in a study authored by Tim Morey, researchers studied the value that 180 internet users placed on keeping personal data secure.[26] Web browsing histories were valued at $52.00 per year.




152. Similarly, the value of user-correlated internet browsing history can be quantified, because Google Inc. was willing to pay users for similar information. Google had a panel called "Google Screenwise Trends" which, according to the internet giant, is designed "to learn more about how everyday people use the Internet." Upon becoming a panelist, internet users would add a browser extension that shares with Google the sites they visit and how they use them. The panelists consented to Google tracking such information for three months in exchange for one of a number of "gifts," including gift cards to retailers such as Barnes & Noble, Walmart, and Overstock.com. After three months, Google also agreed to pay panelists additional gift cards "for staying with" the panel. These gift cards, mostly valued at exactly $5, demonstrated that internet

---

[26] Tim Morey, *What's Your Personal Data Worth?*, DESIGN MIND (Jan. 18, 2011), https://web.archive.org/web/20131206000037/http://designmind.frogdesign.com/blog/what039syour-personal-data-worth.html.

industry participants understood the enormous value in internet users' browsing habits. Google pays Screenwise panelists up to $3 per week to be tracked.

153. User-correlated URLs have monetary value. They also have non-monetary, privacy value. For example, in a study by the Pew Research Center, 93% of Americans said it was "important" for them to be "in control of who can get information" about them. Seventy-four percent said it was "very important." Eighty-seven percent of Americans said it was "important" for them not to have someone watch or listen to them without their permission. Sixty-seven percent said it was "very important." And 90% of Americans said it was "important" that they be able to "control[] what information is collected about [them]." Sixty-five percent said it was very important.

154. Likewise, in a 2011 Harris Poll study, 76% of Americans agreed that "online companies . . . control too much of our personal information and know too much about our browsing habits."

155. A number of platforms have appeared where consumers can and do directly monetize their own data, and prevent tech companies from targeting them absent their express consent:

a. Brave's web browser, for example, will pay users to watch online targeted ads, while blocking out everything else.[27]

b. Loginhood states that it "lets individuals earn rewards for their data and provides website owners with privacy tools for site visitors to control their

[27] Get Paid to Watch Ads in the Brave Web Browser, at: https://lifehacker.com/get-paid-to-watch-ads-in-the-brave-web-browser-1834332279#:~:text=Brave%2C%20a%20chromium-based%20web%20browser%20that%20boasts%20an (Lifehacker, April 26, 2019) ("The model is entirely opt-in, meaning that ads will be disable by default. The ads you view will be converted into Brave's cryptocurrency, Basic Attention Tokens (BAT), paid out to your Brave wallet monthly").

data sharing," via a "consent manager" that blocks ads and tracking on browsers as a plugin.[28]

c. Ex-presidential candidate Andrew Yang's "Data Dividend Project" aims to help consumers, "[t]ake control of your personal data. If companies are profiting from it, you should get paid for it."[29]

d. Killi is a new data exchange platform that allows you to own and earn from your data.[30]

e. Similarly, BIGtoken "is a platform to own and earn from your data. You can use the BIGtoken application to manage your digital data and identity and earn rewards when your data is purchased."[31]

f. The Nielsen Company, famous for tracking the behavior of television viewers' habits, has extended their reach to computers and mobile devices through Nielsen Computer and Mobile Panel. By installing the application on your computer, phone, tablet, e-reader, or other mobile device, Nielsen tracks your activity, enters you into sweepstakes with monetary benefits, and earn points worth up to $50 per month.[32]

---

[28] https://loginhood.io/. *See also* https://loginhood.io/product/chrome-extension ("[s]tart earning rewards for sharing data – and block others that have been spying on you. Win-win.").

[29] How Does It Work, at: https://www.datadividendproject.com/ ("Get Your Data Dividend…We'll send you $$$ as we negotiate with companies to compensate you for using your personal data.").

[30] https://killi.io/earn/.

[31] https://bigtoken.com/faq#general_0 ("Third-party applications and sites access BIGtoken to learn more about their consumers and earn revenue from data sales made through their platforms. Our BIG promise: all data acquisition is secure and transparent, with consumers made fully aware of how their data is used and who has access to it.").

[32] Kevin Mercandante, *Ten Apps for Selling Your Data for Cash, Best Wallet Hacks* (June 10, 2020), https://wallethacks.com/apps-for-selling-your-data/.

156. Technology companies recognize the monetary value of users' sensitive, personal information, insofar as they encourage users to install applications explicitly for the purpose of selling that information to technology companies in exchange for monetary benefits.[33]

157. In a 2015 study by the Ponemon Institute, researchers determined the value that American Internet users place on their "health condition" as more valuable than any other piece of data about them, with a minimum value of $82.90.22.[34]

158. Medical information derived from medical providers garners even more value from the fact that it is not available to third party data marketing companies because of strict restrictions on provider disclosures under HIPAA, state laws, and health plan standards.

159. Even with restrictions on the disclosure of personally identifiable health information, a robust market exists for the trade of de-identified health data.[35]

160. Property is the right of any person to possess, use, enjoy, or dispose of a thing, including intangible things like data and communications. Plaintiff and Class Members have a vested property right in their individually identifiable health information.

161. Illinois courts have described property broadly:

---

[33] Kari Paul, *Google launches app that will pay users for their dat*a, The Guardian (June 11, 2019), https://www.theguardian.com/technology/2019/jun/11/facebook-user-data-app-privacystudy; Saheli Roy Choudhury and Ryan Browne, *Facebook pays teens to install an app that could collect all kinds of data*, CNBC (Jan. 30, 2019), https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-datatechcrunch.html; Jay Peters, *Facebook will now pay you for your voice recordings*, The Verge (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voicespeech-recognition-viewpoints-prounounciations-app.

[34] *See* Ponemon Institute, *Privacy and Security in a Connected Life: A Study of US Consumers*, March 2015, available at https://vdocuments.site/privacy-and-security-in-a-connected-life-protect-personal-information-from-being.html?page=1.

[35] *See* Adam Tanner, *How Data Brokers Make Money Off Your Medical Records*, Scientific American, https://www.scientificamerican.com/article/how-data-brokers-make-money-off-your-medical-records/ (February 1, 2016); Sam Thielman, *Your Private Medical Data is for Sale – and It's Driving a Business Worth Billions, The Guardian*, https://www.theguardian.com/technology/2017/jan/10/medical-data-multibillion-dollar-business-report-warns (January 10, 2017); Adam Tanner, *The Hidden Global Trade in Plan member Medical Data*, YaleGlobal Online, https://archive-yaleglobal.yale.edu/content/hidden-global-trade-plan member-medical-data (last visited July 15, 2022).

a. "Property consists of certain rights in things secured by law. These rights are usually defined to be the right of user, the right of exclusion, and the right of disposition. In a strict sense, land is not property, but the subject of property." *Rigney v. City of Chicago*, 102 Ill. 64 (1881).

b. "Property is the right and interest which one has in lands and chattels to the exclusion of others. The term 'property' includes every species of valuable right and interest. Value is the price deemed or accepted as equivalent to the utility of anything, and compensation is that which constitutes or is regarded as an equivalent. It is impossible to conceive of a thing such as property wholly separated from the element of value. From the very term 'property' the law infers some value; and, if no value is shown, the inference will be that it is the nominal sum of one cent, one penny, or one dollar." *Illinois Cent. R. Co. v. Commissioners of Highways and Town of Mattoon*, 161 Ill. 247, 251 (1896).

162. The United States Supreme Court has explained that, "Confidential business information has long been recognized as property." *Carpenter v. United States*, 484 U.S. 19, 26 (1987). "Depriv[ation] of [the] right to exclusive use of … information" causes a loss of property "for exclusivity is an important aspect of confidential business information and most private property for that matter." *Id.* at 27. There is no doubt that Defendant has a "property right" in plan member data such that, if Google took such information from Defendant without authorization, Defendant would have a claim for Google's taking of their property. Plan members also have a property right in their own health information that may not be taken or used by Defendant without their authorization for non-health care related reasons.

163. Federal and state law grant plan members the right to protect the confidentiality of data that identifies them as plan members of a particular health care provider and restrict the use of their health data, including their status as a plan member, to only uses related to their care or otherwise authorized by federal or state law in the absence of plan member authorization.

164. A plan member's right to protect the confidentiality of their health data and restrict access to it is a valuable right.

165. In addition to property rights in their health data, plan members enjoy property rights in the privacy of their health communications.

166. Plan member property rights in their health data and communications are established by HIPAA and state health privacy laws that are equally or more stringent than HIPAA.

167. American courts have long recognized common law property rights in the content of a person's communications that are not to be used or disclosed to others without authorization.

168. Property rights in communications and information privacy are established by:

a. The Electronic Communications Privacy Act, including Title I (the Wiretap Act); Title II (the Stored Communications Act); and Title III (the Pen Register Act);

b. State laws that establish a right to keep communications confidential; and

c. Common law information property rights regarding the exclusive use of confidential information that have existed for centuries and continue to exist. *See Folsom v. Marsh*, 9 F.Cas. 342, 346 (C.C.D. Mass. 1841) (Story, J); *Baker v. Libbie*, 210 Mass. 599, 602 (1912); *Denis v. LeClerc*, 1 Mart. (La.) 297 (1811).

169. Defendant's unauthorized acquisition, use, and disclosure of Plaintiff's and Class

Members' individually identifiable health information for marketing purposes violated their property rights to control how their health data and communications are used and who may be the beneficiaries of their data and communications.

170. Plaintiff and Class Members seek to recover the value of the unauthorized access to their Private Information resulting from Defendant's wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's personal information is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP—*i.e.*, a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff and class members have a protectible property interest in their Private Information; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, *i.e.*, evidence regarding the value of similar transactions.

171. Defendant does not provide its services for free. All Delta Dental Company plan members, including Plaintiff, pay the Defendant premiums either directly or indirectly. When Defendant purports to provide plan members with a modern, convenient and secure means of obtaining their services, including accessing its in-network provider list, that is an integral part of the services that Defendant and the Delta Dental Companies provide, that has real value. When

Defendant failed to follow through in providing the promised level of privacy and security, plan members (including Plaintiff) did not receive the full benefit of the bargain that they struck with Defendant and Delta Dental Companies when they paid for their services.

172. In the modern economy, consumers pay for services with more than money.

173. On the Internet, consumers often pay for services by granting the company with which they are engaged a license to collect and use their personal data for marketing purposes.

174. Although increasing in prevalence due to the Internet, there is nothing novel about such arrangements. Bartering occurred prior to the invention of currency. The exchange of a data license for use of a service is a modern-day bartering arrangement.

175. Thus, although certain services do not involve the payment of money, they are not free. Consumers pay for the services by giving a license to use their data instead.

176. The right to collect and use consumer data is valuable and monetizable—by companies and consumers. This is particularly true of health information.

177. On the surface, the price of health plan services includes the payments that users made to Delta Dental Companies, part of which is paid to Defendant to operate the Website. But what Defendant failed to disclose to plan members is that it was also granting itself a license to collect, disclose to third-parties, and use their health information for Defendant's own benefit, including for marketing purposes.

178. In signing up to become a Delta Dental Company plan member, Plaintiff and Class Members granted Defendant and Delta Dental Companies a license to use their information and communications content that was limited to the purposes listed in the Privacy Statement and/or the HIPAA Notice of Privacy Practices pertaining to plan members' dental plans. As described herein, that disclosure does not extend to the disclosure of their protected health information. Thus, the

limits of the data license that Defendant and Delta Dental Companies obtained in order to provide health services to plan members is prescribed by the Privacy Statement and/or the HIPAA Notice of Privacy Practices pertaining to plan members' dental plans and did not include using, disclosing, or selling plan member information for marketing purposes.

179. Defendant overcharged plan members by granting itself a license to use and disclose valuable plan member health data beyond the license and limitations specifically stated in the Privacy Statement and/or the HIPAA Notice of Privacy Practices pertaining to plan members' dental plans.

180. The value of the license can be quantified with reference to a payment of a fair and reasonable royalty for Defendant's use of their Private Information for marketing purposes.

181. Indeed, a reasonable royalty for Defendant to collect, use, and share Private Information for marketing purposes without authorization has monetary value. For example, a 2015 study found respondents placed a value of $59.80 on health information.

182. In addition, some companies sell de-identified health information in the open market. For example, a company named Prognos Health provides a data platform where it purports to sell information from "more than 325 million de-identified plan members."

183. Because Americans typically do not want to sell their personal health information for any purpose and it is illegal to even share such information without express, written authorization, there are fewer open markets for a license to collect or sell personal health information for non-health purposes than other types of data. However, black markets do exist for such data. It has been reported that health data can be "more expensive than stolen credit card numbers" on black markets.

## REPRESENTATIVE PLAINTIFF'S EXPERIENCES

184. Plaintiff logged into the healthcare portal and interacted with the Website located at: https://my.deltadentalcoversme.com/.

185. Plaintiff has logged into the healthcare portal located at https://my.deltadentalcoversme.com/ directly and has been redirected to his healthcare portal from https://www.deltadentalil.com/.

186. Plaintiff exchanged communications with the Website via this web property, including identifying himself to Defendant as a plan member, exchanging communications relating to his status as a plan member, and searching for and identifying in-network medical providers.

187. Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose his personally identifiable information and protected health information; nor did he authorize any assistance with Google's intercepting his communications with the Website. Despite this, Defendant knowingly disclosed Plaintiff's protected health information to Google.

188. By law, Plaintiff is entitled to privacy in his protected health information and confidential communications.

189. Defendant deprived Plaintiff and Class Members of their privacy rights when they: (i) implemented a system that surreptitiously tracked and disclosed Plaintiff's and Class Members' confidential communications, personally identifiable information, and protected health information to a third party; (ii) disclosed plan members' protected information to Google – an unauthorized third-party eavesdropper; and (iii) undertook this pattern of conduct without notifying Plaintiff and Class Members and without obtaining their express written consent.

190. Plaintiff maintains insurance coverage through Delta Dental of Illinois and anticipates needing to use the member services available on the Website going forward, including to search for medical providers, but cannot presently do that without the risk that those confidential

communications will be disclosed to third-parties in the manner described herein.

## TOLLING

191. Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiff did not know (and had no way of knowing) that his Private Information was intercepted and unlawfully disclosed because Defendant kept this information secret. Plaintiff did not discover that Defendant disclosed his personally identifiable information and protected health information to Google, and assisted Google with intercepting his communications, until July 2024.

## CLASS ACTION ALLEGATIONS

192. Plaintiff brings this action on behalf of himself and on behalf of all other persons similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, with such classes defined as follows:

> **Nationwide Class:** All individuals residing in the United States whose Private Information was disclosed to a third party without authorization or consent through the tracking technologies on Defendant's Website.
>
> **Illinois Subclass:** All individuals residing in the State of Illinois whose Private Information was disclosed to a third party without authorization or consent through the tracking technologies on Defendant's Website.

(collectively, the "Classes")

193. Excluded from the Classes are Defendant, their agents, affiliates, parents (including Delta Dental of Wisconsin), subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

194. Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

195. **Numerosity, Fed R. Civ. P. 23(a)(1)**. The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are at least thousands of individuals whose PII and PHI may have been improperly accessed by Google, and the Classes are identifiable within Defendant's records.

196. **Commonality & Predominance, Fed. R. Civ. P. 23(a)(2) and (b)(3)**. Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

a. Whether and to what extent Defendant had a duty to protect the PII and PHI of Plaintiff and Class Members;

b. Whether Defendant had duties not to disclose the PII and PHI of Plaintiff and Class Members to unauthorized third parties;

c. Whether Defendant violated its Privacy Statement and/or the HIPAA Notice of Privacy Practices pertaining to plan members' dental plans by disclosing the PII and PHI of Plaintiff and Class Members to Google, and/or additional third parties.

d. Whether Defendant adequately, promptly and accurately informed Plaintiff and Class Members that their PII and PHI would be disclosed to third parties;

e. Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII and PHI had been compromised;

f. Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient PHI and PII;

g. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII and PHI of Plaintiff and Class Members;

h. Whether Defendant violated the statutes invoked herein;

i. Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

j. Whether Defendant knowingly made false representations in its Privacy Statement;

k. Whether Defendant knowingly omitted material representations with respect to its Privacy Statement; and

l. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their PII and PHI.

197. **Typicality, Fed. R. Civ. P. 23(a)(3)**. Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's use of the Google Tracking Pixels, due to Defendant's misfeasance.

198. **Adequacy, Fed. R. Civ. P. 23(a)(4)**. Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

199. **Superiority and Manageability, Fed. R. Civ. P. 23(b)(3)**. Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a defendant, like Defendant, with significant resources. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

200. **Policies Generally Applicable to the Class**. This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

201. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered;

proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

202. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

203. **Ascertainability & Notice**. Membership in the Class can be determined by objective records maintained by Defendant and adequate notice can be given to Class Members directly using information maintained in Defendant's records.

204. **Class-wide Injunctive Relief, Fed. R. Civ. P. 23(b)(2)**. Unless a Class-wide injunction is issued, Defendant will continue in its failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint as Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

205. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant owed a legal duty to not disclose Plaintiff's and Class Members' Private Information;

b. Whether Defendant owed a legal duty to not disclose Plaintiff's and Class Members' Private Information with respect to Defendant's Privacy Statement and/or the HIPAA Notice of Privacy Practices pertaining to plan members' dental plans;

c. Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

d. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

e. Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

f. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

g. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

**COUNT I.**
**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C. § 2510 *et seq*.**
**On Behalf of Plaintiff and the Class**

206. Plaintiff realleges and incorporates by reference each allegation in the preceding and succeeding paragraphs.

207. The ECPA protects both the sending and receipt of communications.

208. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire, oral, or electronic communication is intercepted.

209. A violation of the ECPA occurs where any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication." 18 U.S.C. §§ 2511(1)(a), (c)-(d).

210. "Intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

211. "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

212. "Contents" includes "any information relating to the substance, purport, or meaning" of the communication at issue. 18 U.S.C. § 2510(8).

213. An "electronic communication service" means "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

214. Plaintiff and Class Members' interactions with Defendant's web properties and their online communications with the Website are electronic communications under the ECPA.

215. Whenever Plaintiff and Class Members interacted with Defendant's web properties, Defendant, through the source code it embedded and ran on its web properties, contemporaneously and intentionally intercepted, and endeavored to intercept Plaintiff's and Class Members' electronic communications without authorization or consent.

216. Whenever Plaintiff and Class Members interacted with Defendant's web properties Defendant, through the source code it embedded and ran on its web properties, contemporaneously and intentionally disclosed, and endeavored to disclose the contents of Plaintiff's and Class Members' electronic communications to third parties, including Google, without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA.

217. Whenever Plaintiff and Class Members interacted with Defendant's web properties Defendant, through the source code it embedded and ran on its web properties, contemporaneously and intentionally used, and endeavored to use the contents of Plaintiff's and Class Members' electronic communications, for purposes other than providing health plan services to Plaintiff and Class Members without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA.

218. Whenever Plaintiff and Class Members interacted with Defendant's web properties Defendant, through the source code it embedded and ran on its web properties, contemporaneously and intentionally redirected the contents of Plaintiff's and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Google.

219. Whenever Plaintiff and Class Members interacted with Defendant's web properties Defendant, through the source code it embedded and ran on its web properties, contemporaneously and intentionally divulged the contents of Plaintiff's and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Google.

220. Defendant intentionally intercepted and used the contents of Plaintiff's and Class Members' electronic communications for the unauthorized purpose of disclosing and, on information and belief, profiting from, Plaintiff's and Class Members' communications by selling the contents to third parties including Google.

221. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of sharing and selling the personal information contained therein.

222. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."

223. Defendant is a "party to the communication" with respect to plan member communications.

224. Defendant's acquisition of plan member communications that were used and disclosed to Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and of Illinois, including:

a. Criminal violation of HIPAA, 42 U.S.C. § 1320d-6;

b. Violation of the Illinois Computer Fraud Act, 720 ILCS 5/17-50;

c. Violation of the Illinois Computer Crime Prevention Law, 720 ILCS 5/17-51; and

d. Violation of the Illinois Deceptive Trade Practices Act, 815 ILCS §§ 510/2, *et seq*.

225. Under 42 U.S.C. § 1320d-6, it is a criminal violation for a person to "use[] or cause[] to be used a unique health identifier" or to "disclose[] individually identifiable health information to another person … without authorization" from the plan member.

226. The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

227. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it:

a. Used and caused to be used cookies associated with specific plan members, including cookies associated with the Google Tracking Pixel, without plan member authorization;

b. Disclosed individually identifiable health information to Google.

228. Defendant's conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Defendant's use of Google source code was for Defendant's commercial advantage to increase revenue from Delta Dental Company existing plan members and gain new plan members for them.

229. Under 720 ILCS, 17-50, "[a] person commits computer fraud when he or she knowingly:

a. Accesses or causes to be accessed a computer or any part therefor, or a program or data, with the intent of device or executing any scheme or artifice to defraud, or as part of a deception;

b. Obtains use of, damages, or destroys a computer or any part thereof, or alters, deletes, or removes any program or data contained therein, in connection with any scheme or artifice to defraud, or as part of a deception; or

c. Access or causes to be accessed a computer or any part thereof, or a program or data, and obtains money or control over any such money, property, or services of another in connection with any scheme or artifice to defraud, or as part of a deception.

230. Defendant's conduct violated the Illinois Computer Fraud Act in that:

a. Defendant accessed Plaintiff's and Class Members' computing devices and data as part of a deception and without their authorization, including through placement of the cookies associated with the Google Tracking Pixel as well as use of source code that commanded Plaintiff's and Class Members' computing devices to send identifiers and the content of communications with the Website simultaneously to Defendant and Google;

b. Defendant obtained, used, and/or removed data from Plaintiff's and Class Members' computing devices as part of a deception and without their authorization, including through placement, use, and removal of the cookies associated with the Google Tracking Pixel as well as use of source code that

commanded Plaintiff's and Class Members' computing devices to send identifiers and the content of communications with Website simultaneously to Defendant and Google;

c. Defendant accessed or caused to be accessed the Plaintiff's and Class Members' computing devices and data, and thereby obtained control over the Plaintiff's and Class Members' property in the form of their computing devices and right to control access and use of their personal health information as part of a deception and without their authorization, including through placement of the cookies associated with the Google Tracking Pixel as well as the use of source code that commanded Plaintiff's and Class Members' computing devices to send identifiers and the content of communication with Defendant simultaneously to Google.

231. The Illinois Computer Crime Prevention Law ("ICCPL") prohibits "computer tampering," and provides a private right of action for whoever "suffers loss by reason of a violation of subdivision (a)(4)." 720 ILCS 5/17-51(c).

232. Subdivision (a)(4) of the ICCPL provides: a) A person commits computer tampering when he or she knowingly and without the authorization of a computer's owner or in excess of the authority granted to him or her: … (4) Inserts or attempts to insert a program into a computer or computer program knowing or having reason to know that such program contains information or commands that will or may… (b) alter, delete, or remove a computer program or data from that computer, or any other computer program or data in a computer subsequently accessing or being accessed by that computer; or (c) cause loss to the users of that computer or the users of a computer which accesses or which is accessed by such program…

233. Defendant violated the ICCPL when it knowingly and without Plaintiff's or Class Members' authorization inserted the cookies associated with the Google Tracking Pixel on Plaintiff's and Class Members' computing devices.

234. The cookies associated with the Google Tracking Pixel, which constitute programs, commanded Plaintiff's and Class Members' computing devices to remove and redirect their data and the content of their communications with the Website to Google.

235. Defendant knew or had reason to know that the cookies associated with the Google Tracking Pixel would command Plaintiff's and Class Members' computing devices to remove and redirect their data and the content of their communications with Website to Google.

236. Defendant knew or had reason to know that its use of the cookies associated with the Google Tracking Pixel would cause Plaintiff and Class Members to suffer a loss, including:

a. The interruption or preclusion of Plaintiff's and Class Members' ability to communicate with the entities that operate the Website for their health plan;

b. The diminution in value of Plaintiff's and Class Members' protected health information;

c. Plaintiff's and Class Members' inability to use their computing devices for the purpose of communicating with the entities that operate the Website for their health plan;

d. The loss of privacy due to Defendant making sensitive and confidential information such as plan member status and searching for in-network providers Plaintiff and Class Members intended to remain private no longer private; and

e. Defendant took something of value from Plaintiff and Class Members and derived benefits therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value.

237. Defendant's acquisition of plan member communications that Defendant used and disclosed to Google was done in violation of the Illinois Deceptive Trade Practices Act, as alleged below.

238. Defendant's acquisition of plan member communications that Defendant used and disclosed to Google was done for purposes of committing trespass to chattels, as alleged below, in that it was accomplished through source code that cause Google cookies (including but not limited to the cookies associated with the Google Tracking Pixel) to be deposited on Plaintiff's and Class Members' computing devices as "first-party" cookies that are not blocked.

239. As a direct and proximate result of Defendant's violation of the ECPA, Plaintiff and Class Members were damaged by Defendant's conduct in that:

a. Defendant harmed Plaintiff's and Class Members' interest in privacy;

b. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no more;

c. Defendant eroded the essential confidential nature of the plan-plan member relationship;

d. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' authorization, informed consent, or knowledge, and without sharing the benefit of such value;

e. Plaintiff and Class Members did not get the full value of the services for which they paid, which included Defendant's duty to maintain confidentiality; and

f. Defendant's actions diminished the value of Plaintiff and Class Members' personal information.

240. Plaintiff, individually, on behalf of the Class Members, seeks all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

**COUNT II.**
**VIOLATION OF THE ILLINOIS EAVESDROPPING STATUTE**
**720 ILCS § 5/14-1, *et seq.***
**On Behalf of Plaintiff and the Class**

76. The Illinois Eavesdropping Statute ("IES"), 720 ILCS § 5/14-1, *et seq*., prohibits the surreptitious interception, recording, or transcription of private electronic communications without the consent of all parties to the conversation and provides a civil cause of action to a person subjected to a violation of the IES against eavesdroppers and their principals.

241. Under 720 ILCS § 5/14-2(a)(3), the IES makes it unlawful for a person to knowingly and intentionally intercept, record, or transcribe, in a surreptitious manner, any private electronic communication to which he or she is not a party unless he or she does so with the consent of all parties to the private electronic communication.

242. Under 720 ILCS § 5/14-2(a)(5), the IES makes it unlawful for a person to knowingly and intentionally use or disclose any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of the IES, unless he or she does so with the consent of all of the parties.

243. Under 720 ILCS § 5/14-2(a)(4), the IES makes it unlawful for a person to knowingly and intentionally "possesses any electronic, mechanical, eavesdropping, or other device knowing that or having reason to know that the design of the device renders it primarily useful for the purpose of the surreptitious overhearing, transmitting, or recording of private conversations or the interception, or transcription of private electronic communications and the intended or actual use of the device is contrary to the provisions of" the IES.

244. The IES defines "private electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, pager, computer, electromagnetic, photo electronic or photo optical system, when the sending or receiving party intends the electronic communication to be private under circumstances reasonably justifying that expectation." 720 ILCS § 5/14-1(e).

245. "Surreptitious," as used in the IES, "means obtained or made by stealth or deception, or executed through secrecy or concealment." 720 ILCS § 5/14-1(g).

246. An "eavesdropper" means "any person…who operates or participates in the operation of any eavesdropping device contrary to the provisions of [the IES] or who acts as a principal[.]" 720 ILCS § 5/14-1(b).

247. A "principal" includes any person who "[k]owingly derives any benefit or information from the illegal use of an eavesdropping device by another" or "[d]irects another to use an eavesdropping device illegally on his or her behalf." 720 ILCS § 5/14-1(c).

248. An "eavesdropping device" is "any device capable of being used to…intercept…electronic communications[.]" 720 ILCS § 5/14-1(a).

249. Plaintiff's communications with the Website constituted private electronic communications. Plaintiff transmitted their communications to Defendant from their computers or

by wire, intended the communications to be private, and reasonably expected the communications to be private under HIPAA, Defendant's express promises of confidentiality, the plan-plan member relationship, and other State and federal laws protecting the confidentiality of Plaintiff's communications.

250. Google was not a party to Plaintiff's private electronic communications with the Website. Plaintiff believed they were only communicating with Defendant, intended for their communications to be directed at Defendant only, and were unaware of the presence of concealed source code that redirected their communications.

251. Google's interceptions of Plaintiff's private electronic communications were knowing, intentional, and surreptitious. Google intentionally designed their source code so that it could be concealed on websites to secretly intercept private communications. On information and belief, Google knew that their source code was capable of, and in fact did, intercept private electronic communications without the consent of all parties to the communications.

252. Google used and disclosed Plaintiff's intercepted communications for advertising purposes.

253. Google's conduct was done without Plaintiff's consent, in violation of 720 ILCS § 5/14-2(a)(3) and (a)(5).

254. Defendant acted as Google's "principal" under the IES. By deploying the source code from Google on its web-property, Defendant directed that Google illegally eavesdrop on Plaintiff's private electronic communications on its behalf and Defendant knowingly derived benefits and information from the illegal eavesdropping in the form of marketing.

255. Defendant further violated 720 ILCS § 5/14-2(a)(4) by possessing the source code, knowing that its design rendered it primarily useful for surreptitiously intercepting private electronic communications contrary to the IES.

256. Defendant's violation of the IES was wanton, reckless, and/or malicious.

257. For Defendant's violations of the IES, Plaintiff and Class Members seek actual damages, punitive damages, injunctive relief, and any other relief the Court deems just.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other Class Members, respectfully requests relief against Defendant as set forth below:

a. Entry of an order certifying the proposed Class and Class pursuant to Federal Rules of Civil Procedure;

b. Entry of an order appointing Plaintiff as representatives of the Class;

c. Entry of an order appointing Plaintiff's counsel as Class Counsel for the Class;

d. Entry of an order for injunctive and declaratory relief as described herein, including but not limited to:

    i. Enjoining Defendant, its affiliates, associates, officers, employees and agents from transmitting or disclosing Plaintiff's and Class Members' personally identifiable plan member data and the contents of their communications to unauthorized third parties;

    ii. Enjoining Defendant, its affiliates, associates, officers, employees and agents from taking Plaintiff's and Class Members' personally identifiable plan member data and the contents of their communications, and any other data except that for which appropriate notice and consent is provided;

iii. Mandating that Defendant, its affiliates, associates, officers, employees and agents hire third-party monitors for a period of at least three years to ensure that all the above steps have been taken; and

iv. Mandating that Defendant, its affiliates, associates, officers, employees and agents provide written verifications on a quarterly basis to the court and counsel for the Plaintiff in the form of a declaration under oath that the above steps have been satisfied.

e. Enter judgment in favor of Plaintiff and each of the other Class Members for damages suffered as a result of Defendant's conduct alleged herein, including compensatory, statutory, and punitive damages; as well as equitable relief including restitution and disgorgement, to include interest and prejudgment interest;

f. Award Plaintiff their reasonable attorneys' fees and costs; and

g. Grant such other and further legal and equitable relief as the court deems just and equitable.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims so triable.

Dated: January 23, 2025

DWOSKIN WASDIN LLP

*s/ Eric Dwoskin*
Eric S. Dwoskin
DWOSKIN WASDIN LLP
433 Plaza Real, Suite 275
Boca Raton, FL 33432
Tel.: (561) 849-8060
edwoskin@dwowas.com

*Attorney for Plaintiff and the putative Class*